278 F.2d 888
 LAKELAND BUS LINES, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LAKELAND BUS LINES, INCORPORATED, and Lakeland Bus
Operators' Association, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LAKELAND BUS LINES, INCORPORATED, Respondent.
 Nos. 13013, 13016, 13017.
 United States Court of Appeals Third Circuit.
 Argued Feb. 5, 1960.
Decided April 14, 1960, Rehearing Denied May 18, 1960,
Supplemental Opinion June 3, 1960.
 
 Paul Spielberg, Washington, D.C. (Stuart Rothman, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Fannie M. Boyls, Atty., N.L.R.B., Washington, D.C., on the brief), for N.L.R.B.
 Herman B. J. Weckstein, Newark, N.J. (William Ryan, Newark, N.J., Donald T. Weckstein, Hartford, Conn., on the brief), for Lakeland Bus Lines and Lakeland Bus Operators' Assn.
 Before GOODRICH, HASTIE and FORMAN, Circuit Judges.
 GOODRICH, Circuit Judge.
 
 
 1
 These cases involve two separate but related orders of the National Labor Relations Board. The first order runs against both Lakeland Bus Lines, Inc. (the Company) and Lakeland Bus Operators' Association, the local union, 122 N.L.R.B. 281 (1958); the second order is directed at the Company alone, 124 N.L.R.B. No. 15 (July 15, 1959). The Company seeks to have the second order set aside; the Board seeks enforcement of both orders. The orders issued pursuant to the usual proceedings under Section 10 of the National Labor Relations Act, 29 U.S.C.A. 160.
 
 
 2
 All the litigation centers around a bus driver named Robert Gibson. In June 1957, he was second in seniority among the drivers employed by the Company; his seniority entitled him to second choice of the runs on this Company's new summer schedule. Gibson made his choice. He chose a run from Dover, N. J., to New York City with dispatching duties at the New York terminal. Before he could sign up for it, however, Martin Grois, the Company manager, Struck out this dispatching feature. Gibson refused to make another choice and that evening called Herbert York, the vice president of the Company, to complain. The next day Gibson made the run from Dover to New York and back. Upon his return he was given two letters, each dated that day. One of then was from the local union. It conveyed the happy news that he was suspended from the union because he had gone directly to management with grievances instead of going through the union's committee as provided for in the collective bargaining agreement. The second letter was from the Company and it informed him that he was discharged because he was no longer in good standing with the union.
 
 
 3
 At the very outset of the case it was apparent that both Company and union were in trouble. The agreement between them provided for union membership for all drivers with no thirty-day provision. This is directly contrary to Sections 8(a)(3) and 8(b)(2) of the Act.[1] The agreement also conditioned employment upon the employee's waiver of his right individually to present grievances to management; this right is expressly protected by Section 9(a) of the Act.[2]
 
 
 4
 Gibson filed a complaint with the Board. The trial examiner made an intermediate report finding that the Company had violated Sections 8(a)(1), 8(a)(2) and 8(a)(3), and that the union had violated Sections 8(b)(1)(A) and 8(b)(2) of the Act,[3] and recommending, inter alia, reinstatement of Gibson with back pay. Before proceedings before the Board were completed and the Board issued any order, Gibson was put back to work. We do not say 'reinstated' because what took place afterward showed that the type of 'reinstatement' he got was not what he was entitled to.
 
 
 5
 The Board adopted the examiner's findings of fact and conclusions of law. One of the provisions in the Board's order was that Gibson be given back pay for the time between his discharge and his restoration to the payroll. This back-pay order was, according to the evidence in the second proceeding, a source of very great irritation to his employers. It is unnecessary, we think, to fill the reports with a recital of the petty incidents leading up to Gibson's second discharge.
 
 
 6
 After his second discharge Gibson brought another complaint and again the Board made an order in his favor. The trial examiner came to the conclusion that the reason for Gibson's second discharge was that he brought the charge and gave testimony against the Company in the first case; thus, the examiner found a violation of Section 8(a)(4) of the Act.[4] This we think took a good deal of exercise of imagination on the part of the examiner. The Board, itself, did not adopt this finding as such. It concluded that the reason for Gibson's second discharge was his insistence, perhaps not too urbanely expressed, on getting the back pay which he was entitled to under the first order. We agree. But the Board went further and concluded that 'the controversy over back pay * * * was inextricably intertwined with and derived from, his original filing of charges against the (Company) and the resultant giving of testimony in support thereof,' and, therefore, Gibson's second discharge was in violation of Section 8(a)(4). 124 N.L.R.B. at . We would have a great deal of difficulty sustaining this as a factual conclusion; sustaining it as a legal conclusion is no easier in light of the plain wording of the section. Be that as it may whether the second discharge constituted an unfair labor practice[5] is of no moment as will appear hereafter.
 
 
 7
 Incidently, it may be noted that the Company vigorously attacks the trial examiner in the second hearing urging that his attitude was passionate and prejudicial and other uninviting things. We do not find this objection to have any merit whatever. The trial examiner's language is strong, but so were the facts.
 
 
 8
 The evidence is sufficient to sustain the Board's order in the first case. The Company could properly be found guilty of unfair labor practices in the discharge of Gibson. He is entitled to an order restoring him to employment, the provision for back pay and the usual notices. The other remedial provisions of the order, except as hereinafter mentioned, are also appropriate. The argument that an enforcement order cannot be given after there has been compliance is not well taken. Authority thoroughly establishes that compliance itself is not sufficient to deprive the Board of its right to secure enforcement to make sure that repetition of the unfair labor practices does not occur in the future.[6] In any event, there is no showing of compliance here. An order directing reinstatement with back pay requires a good faith reinstatement. A rehiring and a subsequent firing because the rehired employee demands the back pay to which he is entitled is not a good faith reinstatement.
 
 
 9
 Without going into the question of whether the Board may properly find a violation of 8(a)(1) and 8(a)(4) where the only wrongdoing shown is the discharge of an employee for insisting on receiving the back pay which the Board previously awarded him, we are not going to enforce the second order. The reason is that an order by this Court for Gibson's reinstatement, back pay and the requisite notices will give him everything to which he is entitled. If the respondent does not obey this order in good faith it is in contempt, and the Court has ample power to take care of the situation.
 
 
 10
 There is one final point in the case. Without any request from the General Counsel or any suggestion by the trial examiner, the Board included in its first order two paragraphs providing against the Company that it:
 
 
 11
 '(4) Jointly and severally with the Respondent Association reimburse its employees for all initiation fees, dues, assessments, and other moneys illegally exacted as a condition of union membership by said Association, liability therefor to begin 6 months prior to the date of the filing and service of the charge against each Respondent, and to extend to all such moneys thereafter collected,'
 
 
 12
 and that the union:
 
 
 13
 '(3) Jointly and severally with the Respondent Company reimburse the employees of the Respondent Company for all initiation fees, dues, assessments, and other moneys illegally exacted as a condition of union membership by Respondent Association, liability therefor to begin 6 months prior to the date of the filing and service of the charge against each Respondent and to extend to all such monies thereafter collected.'
 
 
 14
 We think there is no authority to make such an order. The basis of such authority, or lack of it, is discussed in our recent decision of N.L.R.B. v. United States Steel Corp. (American Bridge Division) 3 Cir., 278 F.2d 896. There is no showing in this case that any employees were coerced into joining or remaining in the union. There is no proof that the union was company-sponsored or dominated. Therefore, the case does not come under the rule in Virginia Electric & Power Co. v. N.L.R.B., 1943, 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568.
 
 
 15
 It was claimed at argument that the union has never collected any dues. Argument, of course, is not proof. But it does seem to us that an inquiry into this situation might well have been made before the very powerful Brown-Olds remedy was administered.
 
 
 16
 We, therefore, modify the Board's order by striking out the paragraphs quoted.
 
 
 17
 The Board's order in our number 13,016 will be enforced with the exception just noted. The Board's order in our numbers 13,013 and 13,017 will be set aside as unnecessary.
 
 Supplemental Opinion
 
 18
 PER CURIAM.
 
 
 19
 Following the precedent in our Supplemental Opinion in NLRB v. United States Steel Corporation (American Bridge Division), 3 Cir., 278 F.2d 903, we are modifying the Board's submitted decree to narrow the scope of its application to those matters which were before the Board for adjudication. The modifications follow what we did in that case and are for the same reason.
 
 
 20
 The sections of the decree affected by this opinion are as follws: 1(a)(1), 1(a)(2), 1(a)(5), 2(a)(2), 2(a)(3), and 2(a)(4). Also affected are paragraphs (1), (2) and (5) of the Notice required to be posted by the employer and paragraphs (1), (3) and (4) of the Notice required to be posted by the union.
 
 
 
 [1]
 See note 3 infra
 
 
 [2]
 'Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: Provided, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect * * *.' 29 U.S.C.A. 159(a)
 
 
 [3]
 The applicable provisions of Section 8 read as follows:
 '158. Unfair labor practices
 '(a) It shall be an unfair labor practice for an employer--
 '(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 '(2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it * * *
 '(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such argeement when made and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with section 159(f), (g), (h) of this title, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: Provided further, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;
 '* * * * de
 '(b) It shall be an unfair labor practice for a labor organization or its agents--
 '(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title * * *
 '(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodicdues and the initiation fees uniformly required as a condition of acquiring or retaining membership * * *.' 29 U.S.C.A. 158.
 
 
 [4]
 '(a) It shall be an unfair labor practice for an employer--
 '* * * *hal
 '(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;' 29 U.S.C.A. 158(a)(4).
 
 
 [5]
 The Board also found that the second discharge was in violation of Section 8(a)(1) of the Act. But this finding is sustainable in this case only if either (1) the second discharge was a result of the same unfair labor practices that precipitated the first discharge, or (2) a right to back pay previously awarded by the Board is a right 'guaranteed' by Section 7 of the Act
 Reaching either the first conclusion, a factual one, or the second conclusion, a legal one, is beset with as many difficulties as reaching the conclusion that the second discharge was in violation of Section 8(a)(4).
 
 
 [6]
 N.L.R.B. v. Mexia Textile Mills, 1950, 339 U.S. 563, 567-568, 70 S.Ct. 833, 94 L.Ed. 1067. See also N.L.R.B. v. Trimfit of California, Inc., 9 Cir., 1954, 211 F.2d 206, 208; N.L.R.B. v. Reed, 9 cir., 1953, 206 F.2d 184, 191; N.L.R.B. v. L. Ronney & Sons Furniture Mfg. Co., 9 Cir., 1953, 206 F.2d 730, 738, certiorari denied 1954, 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425. Compare N.L.R.B. v. National Biscuit Co., 3 Cir., 1950, 185 F.2d 123 with N.L.R.B. v. Hill Bros. Co., 5 Cir., 1947, 161 F.2d 179, and N.L.R.B. v. Bradley Washfountain Co., 7 Cir., 1951, 188 F.2d 357