BUSH HOG MANUFACTURING CO., INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 90260–90268.   Filed July 16, 1964.

*Walter L. Mims* and *Thomas A. Ritchie,* for the petitioners.
*Homer F. Benson,* for the respondent.

DRENNEN, *Judge:* In these consolidated cases respondent determined deficiencies in the income tax of petitioners for the fiscal years and in the amounts as follows:

[1] Proceedings of the following petitioners are consolidated herewith: Bush Hog Distributors, Inc., docket No. 90261; Bush Hog of Mississippi, Inc., docket No. 90262; Bush Hog of La.-Ark., Inc., docket No. 90263; Bush Hog Sales Co., Inc., docket No. 90264; Bush Hog-Central, Inc., docket No. 90265; Bush Hog-Seaboard, Inc., docket No. 90266; Bush Hog of Texas, Inc., docket No. 90267; and Bush Hog of Alabama, docket No. 90268.

| Docket No. | Petitioner | Fiscal year ending Nov. 30— | Deficiency |
|---|---|---|---|
| 90260 | Bush Hog Manufacturing Co., Inc. | 1957<br>1958 | $120,785.20<br>136,544.19 |
| 90261 | Bush Hog Distributors, Inc. | 1957<br>1958 | 5,600.70<br>5,500.00 |
| 90262 | Bush Hog of Mississippi, Inc. | 1957 [1]<br>1958 | 831.33<br>3,475.11 |
| 90263 | Bush Hog of La.-Ark., Inc. | 1957 [1]<br>1958 | 1,361.46<br>5,500.00 |
| 90264 | Bush Hog Sales Co., Inc. | 1957<br>1958 | 5,500.00<br>4,826.32 |
| 90265 | Bush Hog-Central, Inc. | 1957 [1]<br>1958 | 1,652.80<br>5,500.00 |
| 90266 | Bush Hog-Seaboard, Inc. | 1957 [1]<br>1958 | 2,290.36<br>4,003.14 |
| 90267 | Bush Hog of Texas, Inc. | 1957 [1]<br>1958 | 1,072.57<br>3,553.48 |
| 90268 | Bush Hog of Alabama | 1957 [1]<br>1958 | 1,370.81<br>5,500.00 |

[1] For the period beginning Aug. 28 to Nov. 30, 1957.

Bush Hog Manufacturing Co., Inc. (hereafter referred to as Manufacturing), during the years here involved, manufactured the Bush Hog cutting machines and the other eight corporations were distributors of its products. The issues for decision are:

■ Did respondent err in attributing all of the net income of the sales companies to Manufacturing as the earner or producer thereof under section 61 of the Code,[2] or in allocating all of the gross income and deductions, and hence net income, of the sales companies to Manufacturing under section 482 of the Code?

■ In the alternative, did respondent err in denying the surtax exemption claimed by each of the sales companies under sections 269 and 1551 of the Code?

■ Did respondent err in disallowing as a deduction a part of the salaries and directors' fees paid by Manufacturing to its four officers during each of the taxable years as being excessive for the services they performed?

Other adjustments determined by respondent were conceded by petitioners.

### FINDINGS OF FACT

The stipulated facts are found as stipulated.

Each of the corporations here involved had its principal place of business in Selma, Ala., and filed its income tax returns for its fiscal years ending November 30, 1957 and 1958, with the district director of internal revenue, Birmingham, Ala.

Manufacturing is an Alabama corporation organized under the name of Lawrence Brothers, Inc., on November 29, 1951. The corporate name was changed to Bush Hog Manufacturing Co., Inc., on

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

January 6, 1956. The certificate of incorporation authorized $50,000 of capital stock divided into 500 shares of no-par common stock. The corporation began business with a capital of $15,000, 6 individuals having each paid $2,500 for 25 shares of the stock. Those individuals were F. W. Lawrence, O. W. Lawrence, W. Leon Jones, Earl Goodwin, Roy Jones, and W. H. Sweeney.

The certificate of incorporation was amended November 1, 1956, and the authorized capitalization was increased to $100,000. Prior to November 1956, an additional 210 shares of the common stock had been issued as stock dividends. On November 30, 1956, the remaining 640 shares of authorized stock were issued as stock dividends. Manufacturing keeps its books and records according to the accrual method of accounting.

Prior to 1951 F. W. Lawrence and O. W. Lawrence had invented and applied for a patent on a machine for use in cutting weeds, bushes, cornstalks, cotton stalks, and hay. The inventors called the machine a Bush Hog, a trade name which is used herein. A patent on the machine was granted to the Lawrence brothers in 1953. Prior to that time the Lawrence brothers had given a license to manufacture Bush Hogs to the Harris brothers of Cordele, Ga. Lawrence Brothers, Inc., was organized for the purpose of distributing Bush Hogs.

In the early part of 1953 Lawrence Brothers, Inc., experimented with the manufacture of Bush Hogs itself and actually began production on a limited scale in the latter part of that year. On August 1, 1953, two new corporations, Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc., were organized for the purpose of distributing Bush Hogs to be manufactured by Lawrence Brothers, Inc.

Each of the two new corporations was an authorized distributor of Bush Hogs and was assigned a separate territory, separated by the Mississippi River, consisting of several States. Each filed its own income tax return and has been recognized as a separate corporation for tax purposes from the date of its organization through the fiscal year ended November 30, 1956.

The certificates of incorporation of both Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc., authorized 1,000 shares of common stock having a par value of $1. Salesmen who worked for each of the corporations were offered an opportunity to purchase stock therein and did so. The stockholders of each of these companies were the 6 principal stockholders of Lawrence Brothers, Inc., each of whom owned 130 shares, and the 4 salesmen of each company, each of whom owned 55 shares. There was no change in the stock ownership of either of these corporations through November 30, 1958.

In 1955 the principal stockholders of Lawrence Brothers, Inc., were in disagreement regarding expansion of the corporation's operations. F. W. and O. W. Lawrence advocated a sale of the entire stock of the corporation to an unrelated corporation and had actually negotiated such a sale of their own stock. The remaining stockholders did not want to sell their stock. As a result of this difference of opinion, Lawrence Brothers, Inc., acquired the stock of F. W. and O. W. Lawrence, and in January 1956 the corporate name was changed to Bush Hog Manufacturing Co., Inc. Thereafter W. Leon Jones, Roy Jones, W. H. Sweeney, and Earl Goodwin, as equal owners of all of the outstanding stock of Manufacturing, were free to expand.

The sales of Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc., were increasing rapidly by 1957. On August 28, 1957, six additional distributing corporations were formed and were assigned separate territories for distributing the products of Manufacturing, consisting in part of some of the territory previously assigned to Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc., and in part of territories in which Manufacturing's products had not previously been sold. All salesmen in each of the new companies were given opportunities to purchase stock in the new companies not to exceed a total of 10 percent of the capital stock thereof. The six new corporations, which were incorporated under the laws of Delaware, were assigned the territories indicated below and their stock was owned as follows:

| Corporation | Territory | Stockholder | Shares |
|---|---|---|---|
| Bush Hog of Miss., Inc. | Mississippi | W. H. Sweeney | 450 |
| | | Roy Jones | 450 |
| | | Earl Goodwin | 450 |
| | | W. Leon Jones | 450 |
| | | W. B. Hicks | 200 |
| Bush Hog of La.-Ark., Inc. | Louisiana and Arkansas | W. H. Sweeney | 450 |
| | | Roy Jones | 450 |
| | | Earl Goodwin | 450 |
| | | W. Leon Jones | 450 |
| | | Fred P. Hallum | 100 |
| | | Jack Bell | 100 |
| Bush Hog of Ala., Inc. | Alabama | W. H. Sweeney | 450 |
| | | Roy Jones | 450 |
| | | Earl Goodwin | 450 |
| | | W. Leon Jones | 450 |
| | | Simon Davenport | 200 |
| Bush Hog-Seaboard, Inc. | Florida, Georgia, North Carolina, and South Carolina. | W. H. Sweeney | 450 |
| | | Roy Jones | 450 |
| | | Earl Goodwin | 450 |
| | | W. Leon Jones | 450 |
| | | R. F. Head, Jr | 67 |
| | | D. C. Gallbranner | 67 |
| | | B. A. Allgood, Jr | 66 |
| Bush Hog-Central, Inc. | Tennessee, Kentucky, and Ohio. | W. H. Sweeney | 450 |
| | | Roy Jones | 450 |
| | | Earl Goodwin | 450 |
| | | W. Leon Jones | 450 |
| | | Fred Cain | 100 |
| | | Forrest Lytle | 100 |
| Bush Hog of Tex., Inc. | Texas | W. H. Sweeney | 450 |
| | | Roy Jones | 450 |
| | | Earl Goodwin | 450 |
| | | W. Leon Jones | 450 |
| | | E. B. Ray | 200 |

Under the contract of employment whereby the salesmen of the distributor corporations acquired stock, they were required on termination of their employment to transfer the shares back to the company at a price to be determined under the provisions of the agreement, which provided for purchase at the highest of the following: $200 per share or with 1 year's service 10 percent of book value; with service of 2 or more years 20 percent of book value; or with service of 10 or more years 100 percent of book value.

The stock ownership of the four principal stockholders in all of the corporations, W. Leon Jones, Roy Jones, W. H. Sweeney, and Earl Goodwin, remained unchanged during the taxable years involved.

Manufacturing entered into a contract with each of its distributor corporations granting a franchise to sell and service Bush Hog products. Under the provisions of the contract, Manufacturing could cancel the contract and terminate the franchise at will.

The books and records of the six new distributor corporations were separately maintained in the office of Manufacturing in Selma, Ala., the personnel of which performed administrative functions for them, including the keeping of books and records. For such services Manufacturing charged the distributor corporations a management fee to cover the services and space provided for them.

Under the method of operation, sales made by the representatives of the distributor corporations to dealers, wherever made, were subject to acceptance at Selma by Manufacturing. On acceptance of the order, Manufacturing shipped the machinery to the dealer and billed the distributor company for the wholesale price. The dealer was billed the retail price in the name of the distributing corporation, and the transaction was recorded on the books of the distributing corporations as well as on the books of Manufacturing. The gross profit of the distributor making the sale was the difference between the price Manufacturing charged the sales corporation and the price the sales corporation charged the customer. The discount at which Manufacturing sold the machines to the sales corporations was not greater than the discount it would have had to give an unrelated distributor of its products. The distributor corporations carried no inventory and their assets consisted principally of cash and accounts receivable. The distributors often discounted trade acceptances at the bank.

In addition to paying Manufacturing a wholesale price for the machinery, the distributor corporations paid it a fee of 3½ percent of sales to cover cost of management, bookkeeping, office supplies, use of office space and equipment, clerical and secretarial services, advertising, and other expenses.

For the periods involved, the corporations reported the following net incomes:

| Taxpayer | Fiscal year ending Nov. 30, 1957 | Fiscal year ending Nov. 30, 1958 |
|---|---|---|
| Bush Hog Mfg. Co., Inc. | $62,884.90 | $298,200.59 |
| Bush Hog Distributors, Inc. | 69,318.68 | 30,951.36 |
| Bush Hog Sales Co., Inc. | 82,433.17 | 21,937.82 |
| Bush Hog-Seaboard, Inc. | [1] 10,405.05 | 18,196.10 |
| Bush Hog of La.-Ark., Inc. | [1] 6,182.69 | 35,615.68 |
| Bush Hog of Tex., Inc. | [1] 4,869.60 | 16,152.20 |
| Bush Hog-Central, Inc. | [1] 7,507.05 | 27,984.66 |
| Bush Hog of Miss., Inc. | [1] 3,773.07 | 15,795.94 |
| Bush Hog of Ala., Inc. | [1] 6,225.21 | 54,735.41 |

[1] For the period Aug. 28, 1957, to Nov. 30, 1957.

The gross sales and net income reported by Manufacturing were as follows:

| Year ended Nov. 30— | Sales | Net income |
|---|---|---|
| 1952 | $516,797.40 | $30,601.63 |
| 1953 | 647,650.61 | 13,999.17 |
| 1954 | 606,412.18 | 23,885.30 |
| 1955 | 932,182.15 | 26,780.38 |
| 1956 | 1,034,269.03 | 65,620.22 |
| 1957 | 1,351,326.64 | 62,884.90 |
| 1958 | 1,911,258.94 | 298,200.59 |

The gross income reported and deductions claimed by the respective companies, and the net income of the respective corporations attributed to Manufacturing by respondent, together with the disallowed deductions, were as follows:

| Company | Per return Nov. 30, 1957, gross income (deductions) | Deductions disallowed not in dispute | Net amount attributable to Manufacturing |
|---|---|---|---|
| Bush Hog Sales Co., Inc. | $177,937.49 (95,504.32) | | $82,433.17 |
| Bush Hog Distributors, Inc. | 202,758.31 (133,439.63) | $193.64 | 69,512.32 |
| Bush Hog-Seaboard, Inc. | 20,084.36 (9,679.31) | 2.42 | 10,407.47 |
| Bush Hog of La.-Ark., Inc. | 12,883.23 (6,700.54) | 2.42 | 6,185.11 |
| Bush Hog of Tex., Inc. | 10,038.03 (5,168.43) | 2.42 | 4,872.02 |
| Bush Hog of Miss., Inc. | 6,304.42 (2,531.35) | 2.42 | 3,775.49 |
| Bush Hog-Central, Inc. | 18,345.42 (10,838.37) | 2.42 | 7,509.47 |
| Bush Hog of Ala., Inc. | 11,367.70 (5,142.49) | 2.42 | 6,277.63 |
| Total | 459,718.96 (274,004.44) | 208.16 | 190,922.68 |

| Company | Per return Nov. 30, 1958, gross income (deductions) | Net amount attributable to Manufacturing |
|---|---|---|
| Bush Hog Sales Co., Inc. | $75,430.11 (53,492.29) | $21,937.82 |
| Bush Hog Distributors, Inc. | 89,612.27 (58,660.91) | 30,951.36 |
| Bush Hog-Seaboard, Inc. | 73,053.27 (54,857.17) | 18,196.10 |
| Bush Hog of La.-Ark., Inc. | 90,280.61 (54,664.93) | 35,615.68 |
| Bush Hog of Tex., Inc. | 53,025.01 (36,872.81) | 16,152.20 |
| Bush Hog of Miss., Inc. | 41,829.70 (26,033.76) | 15,795.94 |
| Bush Hog-Central, Inc. | 95,682.70 (67,698.04) | 27,984.66 |
| Bush Hog of Ala., Inc. | 114,154.63 (59,419.22) | 54,735.41 |
| Total | 633,068.30 (411,709.13) | 221,369.17 |

Except for a stock dividend paid by Manufacturing in 1956, none of the corporations have paid any dividends from the dates of their respective organization through the taxable years involved.

The principal officers of Manufacturing were also the principal officers of the eight distributor corporations. Each of the officers devoted his full time to the operation of the nine Bush Hog corporations and the wholly owned subsidiaries. W. Leon Jones was president of Manufacturing and treasurer of the sales companies; Earl Goodwin was executive vice president of Manufacturing and president of the sales companies and his primary duties were those of general sales manager; Roy Jones was vice president of Manufacturing and of each of the distributor companies and his principal duties were those of procurement of raw materials, parts, and supplies, and maintenance; and W. H. Sweeney was vice president of Manufacturing and each of the sales companies and his principal duties were those of tooling and production. These officers were also directors of the companies and together made all of the administrative decisions. Formal directors meetings were held approximately once a month, but informal meetings of the four officers were held on a daily basis as required. None of the salesmen were officers in any of the companies.

During the 2 years involved, the four principal officers of the companies received all their compensation from Manufacturing alone. The service fee charged each of the sales companies by Manufacturing was intended to cover a part of the compensation of these officers as well as other services rendered by Manufacturing to the sales companies. The salaries of the four principal officers were fixed by the

four of them meeting near the end of a year to fix their salaries for the next year. The amount of salaries and directors' fees paid the four officers during each of the years here involved and the amount allowed and disallowed as deductions by respondent are as follows:

| Officers' salaries FYE Nov. 30, 1957 | Deducted in return | Deductions proposed by respondent | Disallowance |
|---|---|---|---|
| W. Leon Jones | $41,099.96 | $35,635.53 | $5,464.43 |
| Earl Goodwin | 41,099.96 | 35,685.53 | 5,414.43 |
| Roy Jones | 35,900.00 | 22,616.59 | 13,283.41 |
| W. H. Sweeney | 35,900.00 | 24,599.89 | 11,300.11 |
| Salaries | 153,999.92 | 118,537.54 | 35,462.38 |
| Directors' fees | [1] 4,000.00 | [1] 3,600.00 | 400.00 |
| | [1] 157,999.92 | [1] 122,137.54 | 35,862.38 |
| Officers' salaries FYE Nov. 30, 1958 | | | |
| W. Leon Jones | 40,799.96 | 35,635.53 | 5,164.43 |
| Earl Goodwin | 40,799.96 | 35,685.53 | 5,114.43 |
| Roy Jones | 35,660.00 | 22,616.59 | 12,983.41 |
| W. H. Sweeney | 35,600.00 | 24,599.89 | 11,000.11 |
| Salaries | 152,799.92 | 118,537.54 | 34,262.38 |
| Directors' fees | 4,800.00 | 3,600.00 | 1,200.00 |
| | 157,599.92 | 122,137.54 | 35,462.38 |

[1] As stipulated. The directors' fees actually deducted on the return totaled $2,400, and the directors fees actually allowed in the notice of deficiency totaled $2,000.

None of the sales companies owned offices or warehouses in their respective territories nor did they provide office space for their salesmen. None of the sales corporations owned trucks, cars, or other transportation facilities. No clerical or other employees except the salesmen were employed by any of the sales corporations.

All salesmen of the sales corporations were employed on a commission basis and received 8 percent of their gross sales and were required to pay all of their expenses. Some of the corporations employed only one salesman and others employed more, up to a maximum of six. The salesmen usually provided their own office space which was frequently in their homes, and they provided their own transportation. They used catalogs for selling Bush Hog machines and parts and at times would carry a Bush Hog machine on a trailer attached to their automobiles to demonstrate its use. At times they also serviced the Bush Hog machines they sold. Their compensation was paid by the sales corporation by which they were employed.

Manufacturing owned all of the stock of two subsidiary corporations, namely, Selma Parts Service Co. and Selma Concrete Products Co. Each of these subsidiary corporations operated in Selma, Ala., and maintained an office near Manufacturing. Officers of Manufacturing were also officers of the subsidiary companies and devoted a part of their time and efforts thereto, but received no salaries therefrom.

Each of the four principal officers of Manufacturing owned 24½ percent of the outstanding stock of Manufacturing, 19½ percent of

the outstanding stock of Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc., and 22½ percent of the outstanding stock of each of the other sales companies.

Manufacturing obtained its principal financing from the City National Bank of Selma, Selma, Ala., whose credit limit to each borrower was 10 percent of the bank's capital and surplus. In 1954 the credit limit to any one borrower was $60,000 and it had increased to $70,000 in 1957. The officers of Manufacturing were advised by their bankers that the formation of additional distributing corporations could result in additional borrowing power. After their formation and in each of the years thereafter, each of the sales companies did borrow money from the City National Bank of Selma in amounts ranging from about $10,000 to about $54,000 per company.

Prior to formation of the six new sales companies, the officers of Manufacturing consulted with their banker, their lawyer, and their accountant, who advised them of the advantages and disadvantages, taxwise and otherwise, of forming separate corporations. The decision to form the new corporations was made by the four officers of Manufacturing. Manufacturing transferred no assets to the new corporations and supplied them with no funds, but did grant each of them a franchise to distribute Bush Hog products in their respective territories.

Each of the eight sales companies had separate bank accounts and separate books and records, and their books and records were sufficient to reflect their true net incomes.

In 1963 Manufacturing was authorized to issue additional stock for sale to the public over the counter. Before this could be done, however, it was necessary to merge the eight distributor companies into Manufacturing, which was done. The eight sales companies became wholly owned subsidiaries of Manufacturing as a result of the merger, and the stockholders of the sales companies exchanged their stock for stock in Manufacturing. The mergers were approved by the Securities and Exchange Commission, and the name of Manufacturing was changed to Bush Hog, Inc.

### ULTIMATE FINDINGS

The net income reported by the sales companies was earned by them. The sales companies were viable entities and were not shams.

The obtaining of additional surtax exemptions was not a major purpose for the creation of the six new sales companies in 1957 nor for granting them franchises to sell Bush Hog products.

Evasion or avoidance of Federal income tax by obtaining the benefit of deductions, credits, or allowances which they would not otherwise enjoy, was not the principal purpose for the acquisition of control of

the eight sales companies by the stockholders of Bush Hog Manufacturing Co., Inc.

Reasonable compensation for the services rendered by the four officers and principal stockholders of Manufacturing was as follows:

|  | FYE Nov. 30, 1957 | FYE Nov. 30, 1958 |
|---|---|---|
| W. Leon Jones | $35, 635. 53 | $40, 799. 96 |
| Earl Goodwin | 35, 685. 53 | 40, 799. 96 |
| Roy Jones | 30, 000. 00 | 35, 600. 00 |
| W. H. Sweeney | 30, 000. 00 | 35, 600. 00 |
| Directors' fees | 2, 400. 00 | 4, 800. 00 |

OPINION

The first issue is whether respondent erred in including in the taxable income of Manufacturing all the net income of the eight sales companies under section 61 of the Code, or in allocating to Manufacturing all of the gross income and the deductions, and hence all the net income, of the eight sales companies under section 482 of the Code.

Respondent's reliance on section 61 is based on the principle, as enunciated in *Lucas* v. *Earl*, 281 U.S. 111 (1930), and *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), that income is taxable to the person or entity that in fact earns or produces it, and on the theory advanced in the so-called multiple-corporation cases such as *Aldon Homes, Inc.*, 33 T.C. 582 (1959), and *Shaw Construction Co.*, 35 T.C. 1102 (1961), affd. 323 F. 2d 316 (C.A. 9, 1963), that where separate corporations exist in name and form only and in substance serve no useful business purpose their separate entities may be ignored and all the income taxed to the parent or commonly held corporation which in fact earned it. We do not believe those principles are applicable here.

Petitioners' uncontradicted evidence is convincing that there were sound business reasons for forming separate corporations for wholesaling and distributing the products of Manufacturing in the various States and areas in which they were being sold at retail. The pattern was established when the Bush Hog was first developed of having one company, an unrelated corporation at the outset, manufacture the machines and another company distribute them. When Manufacturing took over the task of making the machines in 1953, two new sales companies were formed, each operating in an assigned area. As the business expanded into new territories it was certainly not unusual that new corporations were formed to handle the distributing and servicing functions in those areas. Salesmen were assigned to each territory, and by use of separate corporations these salesmen were given an opportunity to buy stock in and thus share in the profits of the business they promoted in their particular areas. Petitioners'

witnesses testified that having separate corporations made the book-keeping easier and also was helpful in doing business in and filing the necessary reports in the various States. Respondent produced no evidence to contradict petitioners' evidence except to suggest that the same thing could have been accomplished by making each distribution territory a division of Manufacturing. This might be true but there is no evidence to support it, and petitioners' witnesses testified that it was more efficient and served their business purposes better to operate through separate corporations. We cannot disagree with this business judgment on the record before us.

The evidence is also clear that each of the corporations engaged in business activities and functioned separately from each other and from Manufacturing. Manufacturing was in the manufacturing business. The sales companies were in the selling business. Each served a necessary but separate function in the production and marketing of the Bush Hogs at a profit. Separate books and records were kept for each corporation. They had different salesmen who were paid by the corporation by which they were employed and in which they also owned stock. While most of the bookkeeping was done for all of them by Manufacturing and Manufacturing also paid the salaries of the executive officers of all the companies, each sales company paid Manufacturing a fee based on a percentage of its own sales to cover the cost of these services. There is no evidence that the fee was inadequate—or that there was any shifting of income or expenses between the various companies. Nor is there any evidence to indicate that there was any artificial division of sales or sales territories designed to limit the net income of any one company, as was the situation in the multiple-corporation cases cited above. The various sales companies were viable entities and were not shams. There is no basis on this record for disregarding the separate existence of the sales companies. Cf. *Chelsea Products, Inc.*, 16 T.C. 840 (1951), affd. 197 F. 2d 620 (C.A. 3, 1952).

The situation here is also different from that in *Lucas* v. *Earl, supra, Shaw Construction Co., supra*, and the other cases cited above and relied on by respondent, with regard to who earned the income reported by the selling companies. The income involved here represented the difference between the manufacturer's price to the distributor and the distributor's price to the dealer. The evidence is that the discount or markup was the normal amount that would be made between unrelated parties. In fact, there is evidence that Manufacturing sold to the sales companies here involved at a smaller discount than it would have had to give to an unrelated distributor. And finally the income appears to have been earned by the usual selling and servicing functions of the distributors' employees.

The fact that the machines were usually shipped by Manufacturing direct to the distributor's customers does not mean that Manufacturing earned the sales commissions or discounts. Such a factor might be taken into consideration in working out the financial arrangements between a manufacturer and its distributors, but we have no evidence that the financial arrangements between Manufacturing and the sales companies here were either unreasonable or unusual. Manufacturing was able to make rather substantial profits under these arrangements.

We are convinced by the evidence and have found as a fact that the net income reported by the sales companies was earned by them and is not taxable to Manufacturing under section 61 of the Code. See *Chelsea Products, Inc., supra*, wherein we held for taxpayer under facts less favorable to the taxpayer but quite similar to the facts here. See also *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949) ; *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943).

Respondent also determined that all the gross income and the deductions reported by all of the eight sales companies should be allocated to and included in the income and deductions of Manufacturing under section 482 of the Code.[3] This section provides generally that in the case of two or more organizations or businesses owned or controlled by the same interests, the Secretary or his delegate may allocate gross income and deductions between them if he determines that such allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of such organizations or businesses. It has been said that the Commissioner has considerable discretion in applying this and its predecessor section 45 of the 1939 Code, and that his determination must be sustained unless that discretion has been abused. *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953).

In his notice of deficiency to Manufacturing, respondent did not specifically make the determinations mentioned in the statute—he simply determined that the gross income and deductions of the sales companies should be allocated to and included in the income and deductions of Manufacturing, citing section 482. However, there seems to be no dispute that the books and records of the sales companies correctly reflected their net incomes if they in fact earned it, which we have found they did.

Respondent states on brief that the purpose of section 482 is to prevent the artificial shifting of income and deductions between two

---

[3] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

or more organizations or businesses owned by common interests, citing *Asiatic Petroleum Co.* v. *Commissioner*, 79 F. 2d 234 (C.A. 2, 1935), affirming 31 B.T.A. 1152 (1935), certiorari denied 296 U.S. 645 (1935), and *Advance Machinery Exch.* v. *Commissioner*, 196 F. 2d 1006 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court. Petitioners do not disagree with the principle stated, nor do we, but here there was no evidence of an artificial shifting of income and deductions in these cases which would require the use of section 482 to accomplish the stated purpose. Respondent argues that the four officers and principal stockholders had the power to shift income between the companies and points to the withdrawal of some of the sales territory from Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc. (the first two sales companies), and dividing it among the six additional sales companies formed in 1957, with a resulting drop in the income of the original sales companies.

We do not think section 482 permits the Commissioner to allocate income and deductions between commonly controlled companies simply because he finds that the common owners have the *power* to shift income. He must determine that the allocation is necessary to prevent the evasion of taxes or to clearly reflect income. In order not to be arbitrary and unreasonable, such a determination must, in our opinion, be based on actual shifting of income or deductions between commonly controlled businesses which would result in an evasion of tax or would incorrectly reflect income—and cannot be based on the mere fact that it might be done.

The only fact respondent points to in support of his determination is that when the new sales companies were formed there was a realinement of the territories of the existing sales companies and a subsequent drop in their income. But this fact does not support respondent's determination. He has not determined that the income and deductions of the new sales companies should be allocated to the old sales companies but rather that the income and deductions of all the sales companies, including the two original ones, should be allocated to Manufacturing. We think such a determination is arbitrary and unreasonable and cannot be permitted to stand. The record before us does not support a determination that the allocation of the income and deductions of the sales companies to Manufacturing is necessary to prevent the evasion of taxes or clearly to reflect the income of the various corporations.

In the alternative, respondent determined that if the income and deductions of the sales companies should not be allocated to Manufacturing then the sales companies were not entitled to the $25,000 surtax exemption provided in section 11(c), relying on sections 1551 and 269.

Section 1551 of the Code,[4] the provisions of which first became a part of the law in 1951 as section 15(c) of the 1939 Code, provides in part that if a corporation transfers all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or was not actively engaged in business at the time of such acquisition, and after such transfer the transferor corporation or its stockholders are in control of the transferee corporation, then the transferee corporation shall not be allowed the $25,000 surtax exemption unless it establishes by a clear preponderance of the evidence that the securing of such exemption was not a major purpose of such transfer. For purposes of this section, control means the ownership of 80 percent of the stock. Respondent concedes that this section is not applicable to Bush Hog Distributors, Inc., and Bush Hog Sales Co., Inc., because the stockholders of Manufacturing did not acquire 80 percent of the stock of those corporations.

Under section 1551 the interdicted purpose of securing the surtax exemption need not be the sole or principal purpose of the transfer; if it was a *major* purpose, the surtax exemption is disallowed. The taxpayer has the burden of establishing a negative proposition, i.e., that the securing of the surtax exemption was not a major purpose of the transfer. *Hiawatha Home Builders, Inc.*, 36 T.C. 491 (1961); *Cronstroms Manufacturing, Inc.*, 36 T.C. 500 (1961); *Truck Terminals, Inc.*, 33 T.C. 876 (1960), affd. 314 F. 2d 449 (C.A. 9, 1963); *Sno-Frost, Inc.*, 31 T.C. 1058 (1959). This presents a factual question to be determined upon consideration of all the circumstances relevant to the transfers.

We believe petitioners have carried their burden on this issue and have found as an ultimate fact that securing the surtax exemption was not a major purpose for the transfers.[5] This conclusion is based

[4] SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT.

If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) * * *, unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. * * * .

[5] While petitioners argued that there was no transfer of property to the original two sales companies within the meaning of sec. 1551, they do not argue that there were no transfers of property to the six new sales companies. Furthermore, in view of our conclusion with respect to the "major purpose" it is not necessary for us to consider this problem. While we held in *Theatre Concessions, Inc.*, 29 T.C. 754 (1958), that the

on the evidence hereinafter discussed indicating that the new sales companies were formed for sound business reasons unrelated to surtax exemptions, and a careful review of the testimony of the witnesses with respect to the consideration given to the tax aspects of the plan, as well as the circumstances existing at the time the new companies were formed.

Several of the officers and principal stockholders of Manufacturing testified that while they were aware of the possible tax benefits to be derived from separate corporations, the gaining of such benefits was not a primary purpose nor even *a* purpose for forming the various sales corporations. Of course this was self-serving testimony and we could not give much weight to it alone. However they also testified affirmatively that the reasons, among others, for forming a separate sales company for each sales territory were to permit the salesmen to acquire proprietary interests in the company they worked for, to avoid having to qualify Manufacturing or a single sales company to do business in numerous States, to make the accounting and reporting to various States easier, to make customers think they were dealing with local companies, to limit liability, and to obtain increased borrowing power from their bank. While we may question the necessity of having eight separate corporations to accomplish some of these purposes, the evidence indicates that the separate corporations made it possible or at least more feasible to accomplish some of these objectives and that they were used for those purposes.

The only evidence that tax avoidance was a purpose in forming the separate corporations is the evidence that the principal officers consulted their banker, their lawyer, and their tax adviser before proceeding with the formation of the new corporations and were advised of the possible tax benefits, and the fact that the overall tax of the nine petitioners was actually reduced by the additional surtax exemptions. However, the tax adviser confirmed the testimony of the officers that when they consulted him they had already tentatively decided to form the additional corporations. He advised them that there might be

transfer of a business activity (theater concessions) by lease constituted a transfer of property within the intendment of sec. 15(c) of the 1939 Code, the transferor there had been operating the concession business before the transfer and we were more concerned with whether a transfer by lease, rather than exchange, came within the scope of the section. Here the six new companies acquired nothing from Manufacturing except franchises to distribute its products in designated areas, an activity which Manufacturing had not been engaged in itself, and they received nothing at all from the two older sales companies which had been engaged in this business activity. There may be some question, which we make no attempt to answer here, that this constituted a transfer of property from one corporation to another within the meaning of sec. 1551, particularly in the light of the avowed intent of Congress in enacting sec. 15(c) of the 1939 Code not to prohibit or discourage expansion of an existing business accompanied by the formation of new corporations. See Joint Committee Staff Summary of Provisions of the Revenue Act of 1951, 1951–2 C.B. 287, 303.

tax disadvantages as well as benefits. There is no indication that he was asked to arrange or rearrange the program in a manner that would take best advantage of the tax benefits, nor is there any indication that he suggested forming separate corporations to the officers for the tax advantages to be gained.

The testimony of the officers is also supported by the testimony of their banker who advised them that they could obtain additional borrowing power from his bank if they had several corporations that were not subsidiaries of Manufacturing; and also by the bank records which indicate that the new corporations did actually borrow considerable sums of money from this bank during the period here involved.

Furthermore there is no evidence that the securing of additional surtax exemptions or other tax benefits had any part in the decision to form the first two sales companies in 1953. As previously noted, when Manufacturing took over the function of manufacturing the Bush Hog machines, the formation of separate corporations to perform the selling and servicing functions was consistent with the pattern that had been established prior to that time. The plan to form additional sales companies to handle the expanding sales activities of the Bush Hog group would appear to be a logical extension of the organization plan previously established.

The business activities of the sales companies were different than the business activities of Manufacturing. While the activities of the six new sales companies may have been similar to the activities of the two existing sales companies, there is no evidence that the sales territories were divided with an eye to limiting the income of any company to $25,000, and there is evidence that each company actively engaged in business in its assigned territory and earned the selling income therefrom. These factors clearly distinguish these cases from *James Realty Company* v. *United States*, 280 F. 2d 394 (C.A. 8, 1960), and *Coastal Oil Storage Co.* v. *Commissioner*, 242 F. 2d 396 (C.A. 4, 1957), as well as *Aldon Homes, Inc., supra*, and *Shaw Construction Co., supra*.

In our opinion the record before us will not support a finding that a major purpose of the stockholders of Manufacturing in forming and acquiring control of the sales companies and granting them franchises to sell Bush Hog products was to secure tax benefits or to avoid or evade taxes in any other manner. We are convinced from the evidence that the stockholders would have proceeded with their plan to form the separate corporations, unless perhaps their advisers had told them there were serious tax or other disadvantages in the plan. Hence section 1551 is not applicable.

The pertinent part of section 269, which is quoted in the footnote,[6] provides that if persons acquire control of a corporation and the principal purpose for which the acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or allowance which such person would not otherwise enjoy, then such deduction, credit, or allowance shall not be allowed. Under this section "control" includes the ownership of 50 percent of the voting stock—which the four principal stockholders of Manufacturing acquired and held in all eight sales companies.

It has now become well established that section 269 is applicable where the contested tax benefit is claimed by the acquired corporation as well as the acquiring person or corporation. *Commissioner* v. *British Motor Car Distributors, Ltd.*, 278 F. 2d 392 (C.A. 9, 1960), reversing 31 T.C. 437 (1958) ; *Thomas E. Snyder Sons Co.*, 34 T.C. 400 (1960), affd. 288 F. 2d 36 (C.A. 7, 1961), certiorari denied 368 U.S. 823 (1961) ; *Frank Spingolo Warehouse Co.*, 37 T.C. 1 (1961). So we must decide here, for purposes of applying section 269, whether the "principal purpose" in forming the separate sales companies was the evasion or avoidance of tax by securing the benefit of additional surtax exemptions.

As under section 1551, the issue under section 269 is a question of fact. However, under section 269 petitioners need prove only that the evasion or avoidance of tax was not the "principal purpose" in forming the sales companies. For the reasons stated above in our discussion of section 1551, we have concluded that the evasion or avoidance of tax by securing the benefit of additional surtax exemptions was not the principal purpose in forming any of the sales companies. Hence section 269 is not applicable. Compare *Alcorn Wholesale Co.*, 16 T.C. 75 (1951).

We conclude that respondent erred in disallowing the surtax exemptions to the eight sales companies.

The final issue is the disallowance of a deduction to Manufacturing in both of its fiscal years 1957 and 1958 of a part of the compensation paid to each of its four officers and principal stockholders. The salaries and directors' fees paid and deducted by Manufacturing and

---

[6] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

   (a) IN GENERAL.—If—

      (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * *

   *       *       *       *       *       *       *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

the salaries and directors' fees allowed and disallowed by respondent are set out in our Findings of Fact. In his notice of deficiency respondent simply determined that a reasonable allowance for officers' salaries and directors' fees was $120,537.54 [7] for 1957 and $122,137.54 for 1958 and gave a breakdown of the salaries allowed and disallowed for each of the four officers.

Respondent's determination is presumed to be correct, and petitioner had the burden of proving that it was entitled to a deduction larger than that allowed by respondent. *Botany Worsted Mills* v. *United States*, 278 U.S. 282 (1929). The test of deductibility of compensation payments is whether they are reasonable and are in fact payment for the services rendered. Sec. 1.162–7(a), Income Tax Regs. This is essentially a question of fact to be determined from all the evidence. The evidence presented on this issue is not very satisfactory.

Petitioners' evidence shows that these four officers formed a competent executive team which was primarily responsible for building a highly successful business which grew from an initial capital investment of $15,000 in 1951 to a complex having combined assets of $4,872,311 and a stockholders' equity of $2,770,002 when the companies were merged and its stock was offered to the public in 1963. Each had a particular phase of the business as his principal concern in addition to participating in all major policy decisions. They worked long hours and spent their full time on the business of the various companies. Their salaries were fixed by themselves at board of directors meetings held near the end of each year to determine what their salaries should be for the following year. According to the testimony of the president this was based on the value of their services.

Respondent offered no evidence to show how he arrived at the salaries he allowed and disallowed but points to the fact that no cash dividends had been paid and argues that it is obvious from the fact that the salaries of W. Leon Jones and Earl Goodwin were the same, and that the salaries of Roy Jones and W. H. Sweeney were the same, that the salaries were in part disguised dividends. Of course this does not explain why the salaries of the two groups were different when they are owned the same amount of stock or what part of the salaries were substitutes for dividends.

Respondent also argues that each of the officers received substantial increases in salaries in 1956 which had been allowed as deductible and that there was no justification for increasing their salaries again for 1957 and 1958. Respondent intimates on brief that the amounts allowed for 1957 and 1958 were the salaries paid and allowed for 1956. However we have no evidence of the salaries paid to the individual

---

[7] See table, fn. 1, p. 720.

officers in 1956. The only evidence on this point is a schedule attached to the 1957 return of Manufacturing which lists officers' salaries paid for 1957 as totaling $153,999.92 and officers' salaries paid for 1956 as totaling $92,366.31.

At the conclusion of the evidence on this issue the Court made an effort to find out why the salaries for 1957 and 1958 were in such odd amounts by asking counsel for petitioners to have any of the officers return to the witness stand to explain it. No satisfactory explanation was given, so we are left with no evidence of how either petitioners or respondent arrived at their respective figures.

We believe petitioners have presented enough evidence to overcome the presumptive correctness of respondent's determination, particularly with respect to the deduction allowed for the salaries of Roy Jones and W. H. Sweeney. One of the salesmen of the company testified that he received gross commissions of more than $30,000 per year, which is more than the salaries allowed by respondent for Roy Jones and W. H. Sweeney. On the other hand we do not have a great deal of evidence upon which to base a finding that the salaries actually paid were reasonable compensation for the services rendered. We hesitate to substitute our judgment on the value of those services for the considered judgment of the officers of the company. However, those officers were also the principal stockholders of the company and of course it would be more beneficial for them to distribute the profits in the form of deductible salaries rather than nondeductible dividends. Under these circumstances we think it was incumbent upon petitioners to present some evidence from disinterested sources to support the reasonableness of the salaries paid.

The individual salaries paid are certainly not exorbitant for a business of this magnitude, but when totaled they represent a rather substantial sum when compared with the net profit of Manufacturing, particularly for the fiscal year 1957. Manufacturing actually reported a net loss from operations for 1957, although the service charge collected from the other companies more than offset the loss. We note that the total officers' salaries paid were increased from $92,366.31 for 1956 to $153,999.92 for 1957. While we recognize that the duties and responsibilities of the officers probably increased considerably with the formation of the new companies and the expansion of the business in 1957, this did not occur until late in the fiscal year 1957 and we do not believe an increase in administrative salaries of this amount was justified for 1957. On the other hand, a comparison of the salaries paid for 1958 with the profits earned in that year, and also with the service charges received from the other companies, is more favorable, and we cannot find that they were unreasonable for that year.

Applying our best judgment to the evidence presented we have concluded that reasonable salaries for the services rendered by W. Leon Jones and Earl Goodwin in 1957 were $35,635.53 and $35,685.53, respectively, and by Roy Jones and W. H. Sweeney were $30,000 each. For the year 1958 we find that the salaries paid to all four officers were reasonable compensation for the services rendered and that respondent erred in disallowing any part of them. Directors' fees will be allowed in the amounts actually claimed on the returns for both years.

*Decisions will be entered under Rule 50.*