VAN DALE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

VAN DALE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1097–70, 1109–70. Filed December 12, 1972.

*Robert J. Johnson* and *John W. Windhorst, Jr.,* for the petitioners. *Jay B. Kelly,* for the respondent.

IRWIN, *Judge:* These cases were consolidated for trial and decision. Respondent determined a deficiency of $199 in the income tax of petitioner Van Dale Corp. for the taxable year ended April 30, 1967, in docket No. 1097–70. The issue for determination in this case is whether respondent correctly allocated royalty income received by North Star Patents, Inc., to petitioner under either section 482[1] or section 61.

In docket No. 1109–70, Van Dale, Inc., several concessions were made by the parties prior to trial. A stipulated settlement of the remaining issue regarding the deductibility of premium paid to

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

redeem convertible debentures was entered into by the parties after trial.

Petitioners are Van Dale Corp. (VDC) and Van Dale, Inc. (VDI). Hereafter, petitioner will be used to refer to VDC.

Petitioner is a Minnesota corporation organized on June 12, 1957, with its principal office at all relevant times in Long Lake, Minn. Petitioner's corporate income tax return was filed for the taxable year ended April 30, 1967, with the district director of internal revenue, St. Paul, Minn.

VDI is a Minnesota corporation organized on August 31, 1962. At all relevant times VDI maintained its principal office in Long Lake, Minn. VDI filed its income tax returns for the taxable years ended April 30, 1965, 1966, and 1967, with the district director of internal revenue, St. Paul, Minn.

In 1950 a corporation known as Van Dale Farm Machines, Inc., was organized. In subsequent years the name of this corporation was changed on a number of occasions, and during the period from May 1, 1962, to January 31, 1963, it used the name Minnesota Feed Lot Automation, Inc. (MFLA). For sake of convenience this corporation will be referred to as MFLA regardless of the point of time under discussion.

As a result of transactions no longer under consideration because of the settlement of issues between the parties, VDI came to acquire as of November 30, 1962, all of the stock of petitioner, MFLA, and a third corporation, Fleming Manufacturing Co., Inc. (Fleming), which was engaged in the manufacture of farm machinery. These four corporations and a fifth, Mechanation Industries, Inc. (Mechanation), discussed *infra*, shall be referred to as the Van Dale companies hereafter. On December 14, 1962, pursuant to a plan of liquidation between VDI and MFLA, MFLA was dissolved with VDI acquiring its assets.

On February 1, 1959, an agreement was entered into between MFLA and petitioner under which MFLA transferred all of its right, title, and interest in certain domestic and foreign patents, patent applications, and licensing agreements to VDC. As consideration for the transfer, petitioner was to pay the amount of $120,000 in yearly payments of $12,000. At the same time, MFLA was granted a non-exclusive, nontransferable license to make, use, and sell the silo un-loaders covered by the patents and patent applications. The license was for the United States and Canada and it was for a period of 5 years. As partial consideration for the license, MFLA agreed to pay petitioner a royalty of 1 percent of its net sales.

The Federal corporation income tax returns of MFLA and petitioner for the taxable periods in which the tax consequences of the transfer of patents were reported were audited by the respondent. Adjustments were proposed, pursuant to sections 61 and 482 of the Internal Revenue Code of 1954, allocating all the royalty income reported by petitioner to MFLA and eliminating the capital gains claimed by MFLA on the transaction. Subsequently, in 1966, VDI as the transferee of MFLA's assets, agreed to the capital gains adjustment and agreed that a certain percent of petitioner's income was allocable to it.

Robert P. White (White) was a patent attorney who left his private practice to take over direction of the Van Dale companies after the death of the original principal shareholder of MFLA, petitioner, and Fleming. As of November 30, 1962, he owned 59.6 percent of the stock of VDI. On July 16, 1963, White and the other shareholders of VDI formed Mechanation Industries, Inc., a Minnesota corporation, as a holding company for their VDI stock. With exception of the taxable year ended April 30, 1965, when it owned only 87 percent of the stock of VDI, Mechanation has owned 100 percent of the stock of VDI at all times.

While White was in private practice, he developed an interest in the possibility of organizing a patent management company. Such a company would buy patents from their owners, develop programs for licensing the use of the patents, and police violations by infringers. White felt that, in addition to bringing expertise to the management of patents that their original owners might not possess, a patent management company offered other advantages which an owner could not obtain if it tried to license its own patents. First, patents could be licensed for use by competitors of the original owners with a smaller possibility of violating antitrust laws. Second, the sale of the patent to the management company might change the income received from the licensing of the patent from ordinary royalty income to capital gains.

During 1965 and 1966, White was in contact with University Patents, Inc. (University), a Chicago-based patent management firm. At this time University was represented on a part-time basis by J. Daniel Stice, who was a patent lawyer of White's acquaintance for a number of years. University was willing to purchase patents which were involved in existing licensing programs by paying the owner 90 percent of the patent royalties over the life of the patent. University proposed to purchase the patents owned by petitioner for this price, but no agreement was ever reached between petitioner and University.

On March 26, 1966, White proposed to the directors of VDI and the shareholders and directors of Mechanation that North Star Patents, Inc. (NSP), a selective patent management company, be established. NSP was not to be directly related to the Van Dale companies but would have a "commonalty of interest" with them because he would have a significant stock interest in the new company. The proposal noted the tax benefits and licensing advantages of selling petitioner's patents to the new company and also pointed out that VDI would benefit from NSP's payment of salary to two of its officers.

Also on March 26, 1966, White sent two memoranda to the Prudential Insurance Co. requesting that it relinquish a security interest that it held in petitioner's patents so that they could be sold to NSP. The memoranda suggested that NSP would in some way be affiliated with the Van Dale companies. Prudential released its security interest in. the patents for nominal consideration in December 1966.

NSP was organized as a Minnesota corporation on January 4, 1967. As of May 1, 1967, the shareholders of NSP and their respective percentage of shares of stock is as follows:

| Name | Percentage | Shares |
|---|---|---|
| Robert P. White | 25 | 15 |
| First National Bank of Minneapolis, trustee of Van Dale companies profit-sharing trust | 25 | 15 |
| Kenneth M. Anderson | 10 | 6 |
| George M. Hansen | 10 | 6 |
| Edward S. Flynn | 10 | 6 |
| Earl S. Osborn | 5 | 3 |
| Jack W. Wicks | 5 | 3 |
| Wilkes P. Covey | 5 | 3 |
| Paul S. Reep | 5 | 3 |

By action of NSP's directors on May 1, 1967, amending their action of January 4, 1967, the shares authorized for issuance to White in consideration of past services rendered were determined to be $375 or $25 per share for the 15 shares authorized to be issued to him. The shares of the other shareholders were authorized to be issued for $25 apiece in cash.

As of June 1968 certificates for shares of NSP stock were not issued.

The following chart indicates the relationships of the individual shareholders of NSP to the Van Dale companies:

| | NSP officers | VDI dir. | VDI officers | VDC dir. | VDC officers | Mechan. stock |
|---|---|---|---|---|---|---|
| White | Chairman of board | Yes | President | Yes | President and treasurer. | 57.39% |
| Anderson | Secretary | | | | | |
| Hansen | President and treasurer. | | | | | |
| Flynn | | | | Yes | Vice president | |

In addition to the relationships outlined above and that of the trustee of the Van Dale companies' profit-sharing trust (who could be removed from office without cause by VDI's board of directors) the following individuals had some relationship to either the Van Dale companies or White:

1. Kenneth M. Anderson is a tax attorney who advised White about the tax consequences of forming NSP;

2. Edward S. Flynn is a former vice president of Fleming;

3. Jack W. Wicks is a patent lawyer who was a friend of White; and

4. Wilkes P. Covey was a personal friend of White.

White signed an employment contract with NSP employing him as NSP's business or general manager for 12 years, for which services White was to receive 20 percent of NSP's net royalty income and 20 percent of other fees received for services rendered.

NSP's directors resolved on January 4, 1967, to pay Floyd E. Buschbom, as NSP's first vice president, a salary of $3,000 per year. Buschbom was also an officer of VDI.

On March 1, 1967, petitioner and NSP entered into an assignment of patents which provided, in part, as follows:

3. VANDALE hereby assigns to NORTHSTAR all of its rights and obligations under all previously entered into and existing license ageeements relating to the above United States and Canadian patents. However, it is specifically understood that no return license included in and under the above license agreements shall be or is assigned to NORTHSTAR and the benefits thereof shall remain with VANDALE.

   \*       \*       \*       \*       \*       \*       \*

6. NORTHSTAR shall pay VANDALE ninety percent (90%) of the royalty income from aforesaid listed patents after deduction of expenses for defending and maintaining said aforesaid listed patents.

7. NORTHSTAR shall render to VANDALE monthly statements each month of each year during the continuance of this agreement and said statements shall show total royalty during the monthly period ending with the last day of the preceding calendar month and total expenses for defending and maintaining said aforesaid listed patents. NORTHSTAR shall accompany each and every statement with payment to VANDALE the moneys thereby shown to be due.

As of April 30, 1967, NSP had no employees other than White, it did not have a full-time office where phone messages could be received during business hours, and it did not have any records other than a checkbook. Prior to April 30, 1967, NSP's only significant activity was collecting royalties from existing licenses on the patents acquired from petitioner.

During 1968 and 1969 NSP employed Donald R. Sjostrom, a patent attorney, as its general manager on a part-time basis. Sjostrom's instructions for this job from White were "to try to get this thing rolling." Sjostrom devoted about 20 percent of his time to NSP and worked the rest of the time for the Van Dale companies. Sjostrom

moved NSP into an office which had a telephone-answering service, made some solicitations for new patents for development and for additional licensees for petitioner's patents, and did pay some attention to possible infringers. Sjostrom characterized his management of NSP as not very successful. At the time of trial he was still employed by the Van Dale companies.

In 1970, J. Daniel Stice (Stice), who had had experience in the patent management field with University, was hired as NSP's general manager. Stice also acquired a 50-percent stock interest in NSP. Stice has been more aggressive in seeking business for NSP than either White or Sjostrom, and to some extent NSP has been successful under his direction.

During the taxable year ended April 30, 1967, NSP received patent royalties on the patents which had been assigned to it by petitioner in the amount of `$37,537, which amount respondent determined to be includable in its entirety in petitioner's gross income for the taxable year ended April 30, 1967. Respondent also eliminated the amount of $33,783 that petitioner reported as long-term capital gains for this taxable year with respect to the actual amounts received from NSP.

### OPINION

Petitioner owned a number of patents which were earning royalties under various licensing agreements. Petitioner's president White believed that there would be several advantages for petitioner and the other Van Dale companies if these patents were sold to a patent management company. First, there might be tax savings because the sale proceeds might be capital gains; and second, a patent management company could more effectively develop licensing programs for the patents with competitors of petitioner without violating antitrust laws. On the other hand, the patents could not be sold to a company wholly unconnected to the Van Dale companies because the Prudential Insurance Co., which had lent the companies substantial amounts of money with the patents as security, would probably not have released its interest in order to permit such a sale.

NSP was formed by White and others to purchase petitioner's patents. White was the only person who had a stock interest in both petitioner and NSP. White owned about 60 percent of the stock of Mechanation, which in turn owned all of the stock of VDI, which owned all of the stock of petitioner; and White also owned 25 percent of the stock of NSP. The other individual shareholders of NSP, while not having any stock interest in the Van Dale companies, were mostly present or past directors, officers, or employees of the Van Dale companies. The stock interest of these individuals did not

exceed 10 percent. The only substantial shareholder of NSP beside White was the Van Dale companies profit-sharing trust.

On March 1, 1967, petitioner transferred its patents to NSP in a transaction treated by the parties as a sale. As consideration for the transfer NSP agreed to pay petitioner 90 percent of the royalties earned by the patents. At this time NSP had paid-in capital of about $1,100, had no employees other than White, had no books and records other than a checkbook, and did not have a full-time office where its phone would be answered during business hours. For about a year after acquiring the patents NSP did little more than collect the royalties earned by the patents.

For the taxable year ended April 30, 1967, respondent allocated to petitioner under section 61 and section 482 all of NSP's gross income and reduced petitioner's gross income by the amount reported to be long-term capital gains from the sale of the patent.

Respondent has not set forth any particular theory to support his action but has argued only in generalities about the assignment-of-income doctrine and the underlying principles of section 482 while closing with an apparently obligatory incantation of *Gregory* v. *Helvering*, 293 U.S. 465 (1935). Quite understandably, petitioner has replied to these arguments only in a general way; however, we believe that petitioner has had an adequate opportunity to present evidence relative to any theory under which respondent's determination might be sustained. For reasons which we shall explain below we do not think that there has been an assignment of income or that section 482 can be used to sustain respondent's determination. We perceive the issues here to be: (1) Whether the transaction between petitioner and NSP constituted a sale of petitioner's patents, and (2) whether the corporate existence of NSP should be disregarded as a sham.

We note first that respondent has not contended that the consideration paid by NSP to acquire the patents was less than what would have been paid by a corporation with no ties at all to petitioner. In fact, the terms existing between petitioner and NSP were basically identical to those offered by University to acquire petitioner's patents. Assuming that there was a sale of the patents, NSP's payment of an arm's-length price virtually eliminates the assignment-of-income doctrine and section 482 from respondent's case. It is beyond question that a taxpayer can divest himself of future ordinary income by completely divesting himself of the asset which generates the income. *Blair* v. *Commissioner*, 300 U.S. 5, 12 (1937). Although the effect of such a sale is to change future ordinary income into capital gains, the sale of an income-producing asset including a patent has never been held to be an assignment of income even though the purchaser of the asset need do no more than await the passage of time to collect

the income. Accordingly, unless either the transfer to NSP was not a sale or the corporate existence of NSP was a sham, petitioner cannot be held taxable on the royalties received by NSP under section 61. We do not find either to be the case here.

We have frankly struggled to find any theory under which section 482 might be held applicable to the present case. Section 482 permits respondent to make allocations of income and other items between commonly controlled organizations where such allocations are necessary to prevent the distortion of reported income or the evasion of taxes. Respondent relies upon section 1.482–1(a)(3) of the regulations, which defines common control as control in fact rather than formal or legal control, to establish the common control of petitioner and NSP. In view of the fact that White was the only person who had either an indirect or direct stock interest in both petitioner and NSP—about 60 percent of petitioner and 25 percent of NSP—respondent's argument is somewhat novel. However, assuming that control existed either through White's stock ownership or through the fact that the other shareholders and officers of NSP were likely to be motivated either by a desire to benefit the Van Dale companies or by their friendship with White, we fail to see how the sale of the patents either distorted petitioner's income or permitted it to evade taxes.

If NSP acquired the patents in a bargain sale from petitioner, an allocation of part or all of NSP's gross income to petitioner might be appropriate under section 482. *Eli Lilly & Co.* v. *United States*, 372 F. 2d 990 (Ct. Cl. 1967); *Jesse E. Hall, Sr.*, 32 T.C. 390 (1959), affd. 294 F. 2d 82 (C.A. 5, 1961). The transaction between petitioner and NSP was not, however, a bargain sale; if there was a sale at all, it was for full consideration. Respondent's allocation of all of NSP's gross income to petitioner is perhaps suggested by our decisions in *Hamburgers York Road, Inc.*, 41 T.C. 821 (1964), and *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073 (1969), affirmed sub nom. *Wisconsin Big Boy Corp.* v. *Commissioner*, 452 F. 2d 137 (C.A. 7, 1971), but it is not supported by those cases. In those two cases we found that the taxpayers used related corporations to conduct an integral part of their businesses and that they provided services and other valuable items to the related corporations for which they were not adequately compensated. In both cases there was a pattern of less than arm's-length dealings between the related corporations which is absent in this case.

Basically, section 482 permits the respondent to make allocations between commonly controlled corporations in order to make their dealings resemble those which might occur between unrelated parties. *Phillip Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F. 2d

53 (C.A. 2, 1970), affirming 52 T.C. 240 (1969); *Huber Homes, Inc.*, 55 T.C. 598 (1971). Section 482 does not permit respondent to make allocations where there is no distortion of income or evasion of taxes through use of a related corporation, nor does it permit respondent to disregard corporate entities. *Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964); *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953). In this case petitioner's gross income would have been no greater if it had sold the patents to a corporation with which it had no ties. For this reason we find respondent's allocation under section 482 to be unreasonable.

Section 482 does not give respondent broad discretion to disallow all tax benefits which might occur in dealings between related taxpayers; Congress has given him a number of other specific weapons for that purpose. Cf. secs. 267, 269, 1239, and 1551. Unless the tax benefit stems from less than arm's-length dealings, the threshold point for applying section 482 is simply not reached.

Despite the fact that respondent's arguments and notice of deficiency were based generally upon section 61, it is not entirely clear that respondent claims that petitioner received ordinary income because the transfer of the patents from petitioner to NSP was a license rather than a sale. Although at one point respondent stated in his brief that he "did not raise a question regarding the applicability of section 1235," he discussed in the same paragraph facts which might indicate that the transfer was not a sale. Because section 1235 is not by its terms applicable to a transfer of a patent by a corporation, we assume that respondent meant that he was not renewing here an argument from prior cases that his regulations under section 1235 are applicable to determine whether a transfer of a patent by corporation qualifies as a sale. See *Donald C. MacDonald*, 55 T.C. 840, 857 (1971). We do assume that respondent does challenge the transfer under existing case law. Petitioner at least argues as if respondent raised the issue.

A sale of a patent occurs where the owner transfers all substantial rights in the patent. *Vincent B. Rodgers*, 51 T.C. 927 (1969). This sale is entitled to capital gains treatment if it otherwise qualifies under either section 1221 or 1231. *Donald C. MacDonald*, *supra* at 859; *Bell Intercontinental Corporation* v. *United States*, 381 F. 2d 1004 (Ct. Cl. 1967). Because a transfer of all substantial rights in a patent is not necessarily a transfer of all rights in the patent, the issue of whether there has been a sale arises only when the transferee receives

less than all the rights in the patent. In this case the March 1, 1967, agreement between petitioner and NSP assigned to NSP all rights in the patents and the benefits of all existing license agreements except return licenses.[2] This exception meant that NSP would not receive the royalties paid by VDI on return licenses created when MFLA originally transferred its patents to petitioner.

In *Bell Intercontinental Corporation* v. *Commissioner, supra,* the Court of Claims approved as a sale a transfer of a patent which excluded the benefits of a return license like the present ones. The court found that the exclusion did not in any way limit the purchaser's use of the patent and that it did not constitute the retention of a substantial right in the patent by the seller. We approved of the reasoning of *Bell Intercontinental Corporation* in *Donald C. MacDonald, supra.* In the absence of any ordered argument on respondent's part we see no reason to depart from these two cases here.

Petitioner held the patents for more than 6 months prior to their sale to NSP and did not hold them for sale to customers in the ordinary course of business. Accordingly, we hold that the sale qualifies for capital gains treatment under either section 1221 or 1231.

The remaining theory under which petitioner might be held taxable on the royalties received by NSP under section 61 requires a determination that the corporate existence of NSP was a sham. Respondent in effect makes this argument in asserting that the formation of NSP served no business purpose except to reduce the taxes of petitioner and by pointing to the facts that NSP's paid-in capital was small, that its stock was not formally issued until at least a year after its incorporation, that its only business activity for some time was the collection of royalties, and that its only books and records were a checkbook.

Although these facts raise doubts about the bona fides of NSP's existence, they are not sufficient for us to hold that the existence of NSP was a sham in view of the Supreme Court's decision in *Moline Properties* v. *Commissioner,* 319 U.S. 436 (1943). In that case the Court stated:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation[2] or to avoid[3] or to comply with[4] the demands of creditors or to serve the creator's personal or undisclosed convenience,[5] so long as that purpose is the equivalent of

---

[2] A return license is a nonexclusive license to use a patent granted by the transferee of a patent to the transferor.

business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Fns. omitted.]

We know of no precedent holding that the existence of a corporation should be disregarded merely because its only activity is to collect income from its property. Because NSP was primarily involved in the passive collection of income, its small paid-in capital and minimal records do not seem unreasonable. During the 2-month period here in issue, NSP did own property, pay a salary to White, and use temporary office quarters. We believe these activities are significant enough indications of corporate life to sustain NSP's existence under *Moline Properties* v. *Commissioner, supra.*

In addition, we do not believe that NSP was merely the alter ego of petitioner for the purpose of collecting royalties because it was to petitioner's advantage for NSP to be independent. Although respondent disputes the point on brief, there is nothing in the record which contradicts the claim of petitioner's officers that programs for policing infringements and for licensing petitioner's patents could be more effectively established if the patents were held by a corporation independent of the Van Dale companies. The claim appears quite plausible in light of the fact that subsequent to the period in issue NSP did take steps toward establishing policing and licensing programs under the direction of Sjostrom and Stice.

The establishment of NSP permitted petitioner to change ordinary royalty income generated by the patents into long-term capital gain while giving petitioner a measure of control over the patents through its ties to NSP. This fact is the substance of respondent's case, but in the absence of applicable statutory authority for disallowance the benefits from the sale of a patent to even a directly controlled corporation are allowable. *Leonard Coplan,* 28 T.C. 1189 (1957); *Roy J. Champayne,* 26 T.C. 634 (1956); and *Thornton G. Graham,* 26 T.C. 730 (1956).

In view of the foregoing we hold respondent's allocation of income from NSP to petitioner to be erroneous.

> *Decision will be entered for the petitioner in docket No. 1097–70.*
>
> *Decision will be entered under Rule 50 in docket No. 1109–70.*