PRESTON W. CARROLL and DOROTHY CARROLL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carroll v. Commissioner
Docket No. 1221-75.
United States Tax Court
T.C. Memo 1978-173; 1978 Tax Ct. Memo LEXIS 340; 37 T.C.M. (CCH) 736; T.C.M. (RIA) 780173; May 10, 1978, Filed Ervin M. Entrekin, for the petitioners. John B. Harper, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1969
$293,044.94
1970
406,237.79
1971
432,503.02
*341 The issues remaining for decision are: (1) whether payments made to a corporation wholly owned by Preston W. Carroll are deductible rental expenses and (2) whether state franchise and excise taxes paid by the corporation are deductible by petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, Preston W. Carroll (Preston or petitioner) and Dorothy Carroll, are husband and wife who resided in Clifton, Tennessee, at the time of the filing of the petition herein. For 1969 and 1970, they filed joint U.S. Individual Income Tax Returns with the Internal Revenue Service Center at Chamblee, Georgia. For 1971, they filed an original and two amended joint U.S. Individual Income Tax Returns with the Internal Revenue Service Center at Memphis, Tennessee. Since 1952, Preston has operated, as a sole proprietorship, Preston Carroll Construction Company (hereinafter the construction company or the proprietorship), which, during the years in issue, was engaged primarily in the construction of sewer lines and sewage treatment plants. *342 In the latter part of 1968, the construction company had a performance bonding capacity of $6,000,000 for all projects and $2,000,000 for any single project. Petitioner wished to bid on jobs which, if the bids were accepted, would require additional bonding capacity, and he discussed this matter with Continental Casualty (his bonding company at that time), which indicated that it would increase the construction company's bonding limit if it could obtain long-term financing of at least $600,000. Initially, petitioner was unable to secure long-term financing. However, in December 1968, he secured a loan with an interest rate of at least 6-1/2 percent due in 18 months in the amount of $1,005,597.22 from First American National Bank, Nashville, Tennessee (First American). Although petitioner placed $1,000,000 of the proceeds in a 4-percent certificate of deposit in the construction company's name at First American, the certificate did not serve as security for the loan. Continental Casualty still refused to increase the bonding limit. Petitioner's bonding agent approached three other insurance companies, none of which was willing to issue performance bonds in the amounts requested *343 by petitioner. The limitation imposed on petitioner's bonding capacity was due to the inadequate accounting methods employed by the construction company and the lack of working capital. A new accountant, Thomas Smith, was hired so that more current and complete financial information could be obtained. In January 1969, Preston Carroll Company, Inc. (hereinafter the corporation), was incorporated pursuant to the laws of the State of Tennessee. The business purposes stated in the certificate of incorporation covered a wide range of activities involving construction and real estate. Petitioner has always been president, treasurer, and sole shareholder of the corporation. Among the reasons for forming the corporation were to make provision for centralized control and limitation of personal liability and eventually to conduct the construction business. In February 1969, United States Fidelity and Guaranty Co. (USF&G) authorized the issuance of performance bonds on two individual projects, but it was unwilling to commit itself to a firm bonding program. USF&G though that it was in its best interests for the certificate of deposit to be cashed in on maturity and used to pay off *344 the First American loan. In or about April 1969, petitioner informed USF&G that, instead of cashing in the certificate of deposit, he would transfer certain heavy equipment and the First American loan to the corporation. The corporation would rent the equipment to the construction company and would use the rental payments to pay off the loan. It was estimated that, due to the lower corporate income tax rates, there would be a net reduction in Federal income tax liability in excess of $70,000 per year on the amounts involved. Such reduction in taxes would help to improve the corporation's working capital position and would thereby assist it in obtaining an increased bonding ceiling. On August 1, 1969, petitioner transferred the construction equipment theretofore used by the construction company to the corporation. The unadjusted basis in the equipment at that time was $2,414,498.95, and accumulated depreciation amounted to $1,613,429.87. In exchange for the equipment, the corporation assumed payment of the balance on three notes of the sole proprietorship, in the aggregate amount of $60,986.02, and executed a note in the amount of $700,000 in partial satisfaction of an obligation *345 owed by petitioner to First American. Petitioner personally guaranteed the $700,000 note. The corporation's net book equity in the equipment, after depreciation, amounted to $40,083.06. Immediately after this transfer, petitioner and the corporation entered into a lease agreement, under which the construction company leased all of the corporation's equipnent. The lease provided as follows: The term of this lease shall be from the date hereof through December 31, 1971 and the LESSEE shall have an option to renew the lease under the same terms and conditions for an additional year and from year to year until and unless the LESSOR within ninety (90) days from the end of the term of any renewal notifies LESSEE that the lease shall no longer be renewable. The rental for the full term of this Agreement shall be $2,500,148, payable at the rate of $86,212 per month, except that LESSEE may skip payments; provided, however, LESSEE may not skip more than eight (8) monthly payments during the term of the Lease. If LESSEE desires to skip more than eight (8) monthly payments, LESSEE shall notify LESSOR and shall agree to pay an interest penalty of one (1%) percent per month skipped in *346 excess of eight months; and, in no event, may LESSEE skip more than eleven (11) months. In addition, the LESSEE shall place all equipment in the best possible operating condition. Rental for the option period shall be as mutually agreed to between the LESSOR and the LESSEE at the time the option is exercised. If the parties cannot agree, rental shall continue at the same annual rate with the LESSEE allowed three monthly skips plus one monthly skip with penalty. In order to exercise its option all LESSEE must do is forward notice in writing deposited in the mail and addressed to the LESSOR, Box 1, Clifton, Tennessee. Maintenance and operation: LESSEE will, at all times and at its own expense keep the Leased Equipment in good working order and operating condition and LESSEE will furnish all replacement parts and maintenance required to preserve the Lease Equipment according to good standards of operation during this lease. The operation and maintenance of the Leased Equipment shall be under the sole and exclusive control of LESSEE and the personnel operating and maintaining the Leased Equipment shall be the agents and employees of LESSEE and not LESSOR. Return of Equipment: *347 Upon the termination of this Lease in any manner whatsoever, or upon any default by LESSEE hereunder, LESSEE shall forthwith deliver and return the Leased Equipment to LESSOR at LESSEE's expense, in as good order and operating condition as when initially delivered to LESSEE and brought up to good working condition by said LESSEE as a part of this lease agreement, ordinary and reasonable wear and tear alone excepted. If LESSEE fails to return said equipment, LESSOR may take such steps as are necessary to repossess same and LESSEE shall be liable to pay all reasonable expenses, including attorney fees. Liability of LESSEE: @LESSEE assumes full responsibility for damage, loss or destruction of the Leased Equipment from the date of delivery until returned to LESSOR. LESSEE assumes full responsibility for and indemnifies LESSOR against and will save LESSOR harmless from any and all loss, liability, damage and expense in connection with any injury to person or property arising from or in connection with the use or operation of the Leased Equipment. Insurance: LESSEE will carry, at its own expense, public liability insurance and property insurance to protect the LESSOR in *348 the amount of not less than Three Hundred Thousand and 00/100 Dollars ($300,000.00) per accident and the equipment shall be insured at its cost or fair market value for replacement purposes. Taxes: LESSEE will pay all taxes, fees and other charges which may be imposed on this transaction or in connection with the use of the Leased Equipment during the term of this Lease. Title and Possession: The Leased Equipment shall at all times, remain and be the sole and exclusive personal property of LESSOR and LESSEE shall have only the right to possession and use of the same under the terms of this lease. It is specifically understood by and between the parties that LESSEE shall acquire no equity in or right of ownership to the equipment and shall have no rights of any description other than those specifically granted herein. Default: This Lease Agreement may be terminated at the election of the LESSOR if the LESSEE is not maintaining the equipment or otherwise complying with the terms and conditions hereof, then LESSOR may take possession of said equipment. In the event of any default by LESSEE, the entire rental provided herein through the term of the lease then in effect *349 shall become immediately due and payable. Assignment : The LESSEE may not assign any of its right, title and interest in and to this lease or any equipment covered thereby without the consent of the LESSOR which consent will not be unreasonably withheld.
Non-Waiver: None of the terms, convenants or conditions of this lease shall be deemed waived by any act of LESSOR unless same is specified in writing. The rent to be charged under the lease was 50 percent of the rentals specified in "AED Rentals," an industry publication showing rental rates for heavy construction equipment. The 50-percent adjustment was made to reflect the age and capabilities of the particular equipment involved and the expected wear and tear on the equipment over the term of the lease. The parties have stipulated that "[the] $86,212 monthly rentals payable by the construction company under the August 1, 1969 equipment lease * * * were reasonable for those items of equipment transferred to the corporation and leased back on that date." On January 2, 1972, the corporation and the construction company executed a First Written Amendment to the Lease Agreement, which provided as follows: 1. The *350 parties agree to follow the terms and conditions of the original Lease Agreement.
2. The parties agree that where the Lessor has replaced worn out equipment or acquired new equipment such replacement and/or new acquisitions are satisfactory for purposes of maintaining the fixed dollar rental at the amount provided in the original lease. 3. The parties further agree to continue the lease on the same terms and conditions with the understanding however that either party may upon 90 days written notice to the other cancel the lease. 4. The parties further agree that the Lessor may at any time and from time to time notify the Lessee that the Lessor elects to demand interest payments on delinquent rentals. Thirty days from and after the date of such demand interest at the rate of ten (10%) percent per annum on the delinquent portion of the rental then due and payable shall accrue. If such a demand is made the parties further [agree] that the Lessee may cancel the Lease effective as of the date interest is to accrue, provided however, that in all events the arrearages shall be paid by the Lessee to the Lessor with interest thereon at the rate of ten (10%) percent per annum plus *351 attorney fees if the Lessor must resort to the courts for collection. The lease continued in effect from August 1969 until January 1975, at which time all of the construction company's assets were transferred to the corporation. During this period, rental payments due the corporation totaled $5,603,780. For each fiscal year ending July 31, the rentals paid and received were as follows: Fiscal year
Rental due
Rental received
1970
$1,034,544
$ 1,034,544
1971
1,034,544
681,696
1972
1,034,544
788,497
1973
1,034,544
718,960
1974
1,034,544
628,527
1975
431,060
173,510
$4,025,734
At no time did the corporation demand, nor did the construction company pay, interest on the delinquent rentals. In purchasing equipment from independent dealers, petitioner had fallen behind as much as four to six months in making scheduled payments; in such instances, petitioner was able to rearrange and delay the times of payment. Prior to 1975, the business of the corporation consisted solely of renting equipment to the construction company, purchasing new equipment, and disposing of old equipment. The rental income was used to satisfy its loan obligations *352 and to purchase new heavy construction equipment. When equipment was purchased on credit, petitioner personally guaranteed the notes given for the purchases. During the period August 1, 1969 to January 1975, petitioner also purchased heavy construction equipment in his own name; such equipment was later transferred to the corporation when it was in a financial position to pay any balance due on the purchase price. Petitioner incurred expenses for repair of construction equipment and vehicles in the following amounts: Year
Cost of Repairs
1969
$689,427
1970
695,737
1971
862,674
1972
769,507
1973
891,585
A substantial portion of these expenses was incurred in repairing equipment rented from the corporation. It is not unusual for the sole shareholder of a corporation to be required to guarantee the obligations of the corporation. The corporation's books and records were maintained in the construction company's office by construction company personnel. For the fiscal year ending July 31, 1970, the corporation paid the construction company $1,200 for these services. Prior to 1975, the corporation had no employees other than its officers and directors. *353 The corporation has never paid dividends. In the notice of deficiency, respondent determined that the transfer of equipment to the corporation in 1969 and the subsequent leaseback lacked economic reality and a business purpose and that the amount claimed as rental payments was not deductible under section 162. [1] He further determined that the income purportedly realized and expenditures purportedly incurred by the corporation should be treated as if realized and incurred by petitioner; in so doing, respondent did not allow as a deduction by petitioner state franchise and excise taxes paid by the corporation. OPINION Prior to August 1, 1969, petitioner operated his construction business as a sole proprietorship. On that date, he purportedly transferred the construction equipment used by the proprietorship to a newly formed corporation in exchange (presumably nontaxable under section 351) for its stock and the assumption of certain liabilities of the proprietorship. Simultaneously with this transfer, the corporation *354 purportedly leased the equipment back to the sole proprietorship, which continued to use the equipment in the same manner as it had prior thereto. In his deficiency notice, respondent determined that the corporation should not be accorded recognition for Federal income tax purposes, i.e., it was a sham, and that all of its income and deductions (except for state franchise and excise taxes) should be attributable to petitioner. [2] The issue as to whether the corporation should be treated as a sham was the centerpiece of the trial and of the original briefs filed by the parties. Recognition of the transfer and leaseback for tax purposes constituted at best a secondary issue, and even then it was intertwined with the question of recognition of the existence of the corporation. [3] However, in his reply brief, respondent conceded that the corporation was not a sham and that its separate legal identity should be recognized, and he directed his fire to the issue previously treated as secondary, namely, that "the sale and leaseback arrangement lacked any economic substance and * * * petitioner should be treated as the owner of the construction equipment for Federal tax purposes." [3] *355 In so doing, respondent has framed the issue in all-or-nothing terms, making no suggestion or argument that the instant situation falls within the ambit of cases involving the disallowance of a portion of claimed rental payments. E.g., Midland Ford Tractor Co. v. Commissioner,277 F. 2d 111 (8th Cir. 1960), affg.T.C. Memo. 1958-213; Ray's Clothes, Inc. v. Commissioner,22 T.C. 1332 (1954). Consequently, as is the situation with respect to the application of section 482 (see footnote 2, supra), the question of partial disallowance is not before us and the frame of reference is that established by the respondent (to which the petitioner has not objected), namely, whether the transfer and leaseback should be recognized for income tax purposes so that petitioners should be allowed the claimed deductions on the ground that they were "required to be made as a condition to the continued use or possession * * * of property," as provided in section 162(a)(3). *356 Before addressing this issue, a few preliminary observations are in order. The bulk of the leaseback cases have arisen in the area of intra-family transfers to trusts, either by way of sale or gift, followed by a leaseback to the transferor. E.g., Mathews v. Commissioner,520 F. 2d 323 (5th Cir. 1975), revg. 61 T.C. 12 (1973); Butler v. Commissioner,65 T.C. 327 (1975); Wiles v. Commissioner,59 T.C. 289 (1972), aff. per curiam 491 F. 2d 1406 (5th Cir. 1974); Penn v. Commissioner,51 T.C. 144 (1968); Furman v. Commissioner,45 T.C. 360 (1966), affd. 381 F. 2d 22 (5th Cir. 1967). Both parties herein have directed a great deal of attention to these cases on brief, petitioners arguing that they have no applicability in a business context involving a corporation and its shareholdrs and respondent maintaining that the principles articulated, particularly with reference to retention of control by the transferor, are clearly relevant to the issue before us. Although the transfer and leaseback cases in the intr-family area have some relevancy to the issue *357 at hand, we find it unnecessary to define the precise parameters of the intra-family trust decisions except to note that, if the element of retention of control were considered the determining factor, no transfer and leaseback between a corporation and its shareholders could be sustained. Any such tenet would raise havoc in situations that otherwise have all the elements of a normal commercial transaction and fails to recognize the realities of the use of the corporate structure in the business world, namely, that "policies and day-to-day activities are determined not as decisions of the corporation but by [the] owners acting individually." See National Carbide Corp. v. Commissioner,336 U.S. 422, 433 (1949). See also Bass v. Commissioner,50 T.C. 595, 601 (1968). Moreover, such an inflexible rule would automatically call into question decisions which have sustained arrangements not unlike those involved herein, e.g., L.W. Tilden, Inc. v. Commissioner,192 F. 2d 704 (5th Cir. 1951), revg. on the basis of a different view of the ultimate *358 factual conclusion a Memorandum Opinion of this Court dated March 16, 1950; Vardeman v. United States,209 F. Supp. 346 (E.D. Tex. 1962). At the same time, we are fully aware of the judicial precept that transactions between a corporation and its controlling shareholders should be given close scrutiny. Ingle Coal Corp. v. Commissioner,174 F. 2d 569 (7th Cir. 1949), affg. 10 T.C. 1199 (1948); cf. Dielectric Materials Co. v. Commissioner,57 T.C. 587, 591 (1972). While control cannot be totally ignored, its presence in the circumstances of this case is not in and of itself determinative of unfavorable tax consequences. Thus, some additional guideline is required. The development of such a guideline should take into account the fact that the right to the use of the property is in the same person both before and after the transfer and leaseback transaction, a situation which does not obtain where property owned by one party is simply leased to another related party and where the issue is the disallowance of a portion of *359 the rental payments. See footnote 5, infra. We think an appropriate guideline can be found in transfers and leasebacks outside of the family context which indicate that the transion will be recognized if there is a legitimate business purpose to be served even though a tax-saving purpose is also present. See L.W. Tilden, Inc. v. Commissioner,supra;Vardeman v. United States,supra.Where no legitimate business purpose is served and the transaction is simply motivated by a desire to minimize taxes, the transfer and leaseback will be disregarded. Armston Co. v. Commissioner,188 F. 2d 531, 533 (5th Cir. 1951), affg. 12 T.C. 539 (1949). We emphasize that the business purpose must have substance; it cannot be one that is "conjured up" or "artificial." See Matthews v. Commissioner, 520 F.2d at 325; Shaffer Terminals, Inc. v. Commissioner,16 T.C. 356, 364 (1951), affd. per curiam 194 F. 2d 539 (9th Cir. 1952). Cf. Ingle Coal Corp. v. Commissioner,supra. *360 To the foregoing, we would add that whatever may be the boundaries of integrating or separating a transfer and leaseback in the intra-family trust situations (cf. Butler v. Commissioner,supra), we think that, in the context of this case, the continued need for the equipment by the construction company was so compelling that the transfer of the equipment and the leaseback should not be treated separately. Under these circumstances, there tends to be an overlapping in the articulation of considerations of "business purpose" and "economic reality." Compare Mathews v. Commissioner,supra;Butler v. Commissioner,supra;Furman v. Commissioner,45 T.C. at 366, n.9. And finally we note that the issue before us is ultimately factual and that its resolution depends upon our evaluation of the totality of the circumstances surrounding the transfer and leaseback of the equipment. See Furman v. Commissioner,supra at 364. Clearly, petitioner believed that, as a result of the transfer, he would be able to increase his bonding capacity by improving his working capital position. Respondent *361 seeks to dismiss the transfer as a paper transaction which would "obviously" not fool anyone. Granted that the improvement in working capital appears to have been effectuated by a balance sheet shuffle and that the bonding company would still be deeply interested in the ability of the sole proprietorship to utilize the equipment in its operation, we cannot say, on the basis of the record before us, that such shuffle did not have an influence on the attitude of the bonding company. Indeed, we think it did have an influence, in the same manner as the previous shuffle in which the petitioner had incurred a long-term liability by borrowing $1,000,000 but had "improved" the working capital position of his sole proprietorship by putting the sum borrowed into a short-term certificate of deposit bearing a low interest rate, i.e., at a net out-of-pocket cost.Moreover, the following factors should not be overlooked: (1) throughout the term of the lease, substantial rental payments were made to or on behalf of the corporation, which resulted in substantial profits for the corporation, on which it paid substantial Federal income taxes (compare Wiles v. Commissioner,supra, *362 and Furman v. Commissioner,supra, in which the alleged transferees received no beneficial enjoyment of the property); [4] (2) profits realized by the corporation were used by it to purchase additional equipment for use in its business; (3) all relevant third parties (i.e., the bank holding a security interest in the equipment and the bonding company) were notified of the transfer of the equipment and were given an opportunity to restructure their arrangements with petitioner and the corporation to protect their interests; and (4) petitioner retained no direct interest in the assets. Its limited range of activities during these years does not require the opposite conclusion. Van Dale Corp. v. Commissioner,59 T.C. 390 (1972). The leaseback of the equipment to the sloe proprietorship has a variety of provisions, some of them unusual, which must be considered. The rent was fixed at $86,212 per month, or $2,500,148 over a two-year-and-five-month term. The parties have stipulated that *363 this rental was "reasonable for those items of equipment transferred to the corporation and leased back on that date," and we think it a fair inference from the stipulation that it was intended to apply at least to the extremely short initial term. Moreover, the rental payments were geared to a 50-percent adjustment in the industry rental rates for heavy construction equipment. [5] Cf. Vardeman v. United States,supra;Felix v. Commissioner,21 T.C. 794, 804 (1954). Under these circumstances, we do not consider the fact that the rents to be paid over the initial lease period were approximately equal to the original cost of the equipment and far in excess of its adjusted basis to the sole proprietorship at the time of transfer to the corporation sufficient to cause us to make the mathematical comparisons which this Court and the court of appeals considered significant in Southeastern Canteen Co. v. Commissioner,410 F. 2d 615 (6th Cir. 1969), affg. on this issueT.C. Memo. 1967-183, and in Shaffer Terminals, Inc. v. Commissioner,supra.
*364 Petitioner was responsible for all replacement parts and maintenance, taxes, insurance, etc. In short, the lease was a net lease. The payments for such items were substantial and we are not prepared to hold that these amounts are necessarily encompassed within respondent's stipulation as to the reasonableness of the monthly rental payments. Nevertheless, the fact of the matter is that there is not the slightest indication that such net lease provisions were not customary in the construction industry insofar as heavy equipment, which is commonly known to be subjected to hard use, is concerned.[6] Cf. Arkhola Sand & Gravel Co. v. United States,190 F. Supp. 29 (W.D. Ark. 1960); Southern Ford Tractor Corp. v. Commissioner,29 T.C. 833, 843 (1958). Given the posture of this case and the stipulation as to the reasonableness of the fixed monthly payment, we think it was at least incumbent upon respondent to raise the issue of the additional payments, irrespective of whether or not he would have been held to have the burden of proof thereon. In the same vein, we think it a significant consideration that, as we have previously pointed out (see pp. 15-16, *365 supra), respondent has not sought to bifurcate the claimed rental payments and to seek a partial disallowance. Nor are we impressed with respondent's argument that the same rental was maintained even though some of the equipment originally subject to the lease became unusable. The record contains evidence that such equipment was replaced by the additional equipment acquired by the corporation or by petitioner, who then transferred his acquisitions to the corporation, and that the value of the total equipment subject to the lease increased during the taxable years before us. Similarly, the fact that petitioner personally guaranteed the obligations of the corporation is of little significance in view of the customary requirement of such a guaranty by a sole shareholder. Petitioner was not a model either of punctuality or in making full payments under the lease. In addition, he was permitted to "skip" eight monthly payments, although eventually *366 interest would be payable on the skipped payments (at a substantial rate of one percent per month). But these provisions did no more than make explicit arrangements for postponing payments for equipment that petitioner had been able to work out with unrelated entities. Moreover, although petitioner made irregular rental payments (a factor which lends some support to respondent's position), the fact of the matter is that petitioner did not exceed the permitted number of skippings during the taxable years before us. Finally, we take note of respondent's argument that it was petitioner's earning power, derived from the use of the equipment, which generated the funds used to pay the rentals and that this indicates that the lease was not bona fide. Whatever relevance this element may have in the area of intra-family transfers (see Kirschenmann v. Westover,225 F. 2d 69, 71 (9th Cir. 1955)), we think it of peripheral significance in the instant case. It cannot be gainsaid that, in the realities of the business world, business operations customarily generate the wherewithal to pay the rent on business premises. Our analysis must also take into account the fact *367 that tax planning and minimization played a role in the transactions involved herein. Respondent has sought to convince us that the fundamental purpose of the transfer and leaseback was tax avoidance and that therefore we should strike them down. As we have previously indicated (see p. 19, supra), we would be the first to acknowledge that "the building may not be constructed entirely from the tax advantage, but if the foundation and bricks have economic substance, the economic or financial inducement of the tax advantage can provide the mortar." See McLane v. Commissioner,46 T.C. 140, 145 (1966), affd. per curiam 377 F. 2d 557 (9th Cir. 1967). On the other hand, given the underlying business purpose of the transactions, namely, to improve petitioner's bonding capacity, [7] evidence that the transactions actually had such an impact (albeit not as great or an lasting as petitioner had hoped), the stipulation as to the reasonableness of the fixed monthly "rental" payment insofar as the years before us are concerned, and the way the trial and briefing of the case evolved, we conclude, on the basis of the entire record, that there was sufficient economic *368 substance to the "foundation and bricks" of the arrangements between the petitioner and the corporation so that the tax advantage simply provided the "mortar," i.e., there was a legitimate substantive business purpose. In this connection, we think it of some significance that the tax savings involved herein had a bearing on petitioner's bonding limits because of the potential increase in his available cash. Moreover, we have not overlooked the facts that the corporation paid substantial taxes during the taxable years before us and that it was possible that the use of the corporate form might well prove disadvantageous to petitioner in the long run. Accordingly, we hold that the transfer to the corporation and the leaseback of the equipment by the sole proprietorship should be recognized for tax purposes and that the claimed rental payments by petitioner should be allowed as payments "required to be made as a condition to the continued use or possession * * * of property," as provided in section 162(a)(3). Cf. Frank LyonCo. v. United States,     U.S.     (Apr. 18, 1978). In view of our holding, we need not decide whether petitioner is entitled to deduct the state franchise *369 and excise tax paid by the corporation.
One final word. Our analysis and holding herein is directed solely to petitioners' taxable years 1969, 1970, and 1971. What we have said may have only a tangential effect with respect to petitioners' right to deductions for similar payments in 1972, 1973, and 1974. The apparently increasing gap, during the latter period, between the amount of payments and the investment in the equipment, the potential impact of the possible failure of petitioner and the corporation to take into account changed conditions when the lease was renewed on January 2, 1972 (including the aging of the equipment), and a different frame of reference for any litigation that may take place *370 could produce a different result.Certainly, respondent's arguments relating to the lease renewal on the same terms and conditions and the disposition of petitioner's unpaid obligations under the lease will have greater relevance to the determination of petitioners' right to the claimed deductions for those years. [8]
Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise indicated.↩
2. Respondent did not invoke and has not invoked the power of allocation under section 482, so the applicability of that section is not before us. Commissioner v. Transport Mfg. & Equip. Co.,478 F. 2d 731 (8th Cir. 1973), affg. on this issue Riss v. Commissioner,56 T.C. 388, 400-401 (1971), and 57 T.C. 469, 472 (1971). Compare Boyer v. Commissioner,58 T.C. 316↩ (1972). 3. The two issues, i.e., whether the corporation is a sham and the recognition of the transfer and leaseback, are separate but not totally unrelated in view of the fact that the only business conducted by the corporation was the leasing and incidental buying and selling of the equipment involved herein.See Charlson v. United States,525 F. 2d 1046, 1057↩ (Ct. Cl. 1975).
4. Compare also Southeastern Canteen Co. v. Commissioner,410 F. 2d 615, 620↩ (6th Cir. 1969), affg. on this issueT.C. Memo. 1967-183.
5. Under these circumstances, although we have recognized that the situations involving the deduction of allegedly excessive rentals are distinguishable (see p. 19, supra), the cases in that area provide some support for petitioner's position herein.Those cases recognize that a transaction between shareholders and their corporationis inherently not at arm's length and establish a guideline as to whether the transaction can be said to achieve "the same result as arm's-length dealings." See Ray's Clothes, Inc. v. Commissioner,22 T.C. 1332, 1337 (1954). Cf. Southeastern Canteen Co. v. Commissioner, footnote 4, supra. See also Little Carnegie Realty Corp. v. Commissioner,T.C. Memo. 1970-150↩.
6. It is common knowledge that requirements that the lessee keep the property in good operating condition and insured, carry liability insurance, and pay taxes in respect of the use of the property are normal provisions of a net lease.↩
7. Petitioners argue that additional business purposes were to centralize control over the business and to limit petitioner's liability from the operation of the construction business.During the taxable years involved, all construction operations were conducted by the proprietorship and petitioner was required to guarantee the corporation's indebtedness. As a result, these alleged business purposes were not furthered by the transfer and leaseback during the years before us.↩
8. See Post Bros.Construction Co. v. Commissioner,T.C. Memo. 1973-257↩.